# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

COREY MILLEDGE,

          Plaintiff,

v.                                Case No. 3:14-cv-248-J-32MCR

WALTER MCNEIL, et al.,

          Defendants.

_____

## <u>ORDER</u>

### *I.*    *Status*

Plaintiff, an inmate of the Florida penal system, initiated this case by filing a pro se Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983.[1] He is currently proceeding on a Second Amended Complaint (Doc. 82), in which he names the following twenty Defendants: Frederick Walker, Brad Whitehead, Michael Jenkins, Brian Norman, Salina Gaskins, Sarah Salle, Julian Bullard, Phillip Maginnis, Vernon Lee, Christopher McFarland, Eric Canida, Barry Walden, Craig Slocum, James Fleming, Michael Harris, Nan A. Jeffcoat, Walter McNeil, Barry Reddish, Jesse Kelly, and Shawn Swain. He raises several claims

---

[1] Plaintiff has filed five other civil rights cases in this Court. <u>See</u> Case Nos. 3:07-cv-976-J-34MCR; 3:17-cv-483-J-39MCR; 2:18-cv-413-FtM-38NPM; 3:19-cv-1406-HLA-JBT; 3:19-cv-1365-J-25JRK. He has also filed a civil rights case in the Northern District of Florida. <u>See</u> Case No. 4:15-cv-577-WS-CAS.

in fourteen Counts, and his factual allegations span from March 2010 to June 2010 as well as May 2011 at Union Correctional Institution.[2]

Before the Court is Defendants' Motion for Partial Summary Judgment (Docs. 163, 164, 167).[3] Plaintiff was previously advised of the provisions of

---

[2] Count I: failure to protect and intervene against Defendants Canida, Lee, and Fleming based on events occurring on March 15, 2010; Count II: deliberate indifference to serious medical needs against Defendant Fleming based on events occurring on March 15, 2010; Count III: excessive force and failure to intervene against Defendants Fleming, Canida, and Lee based on events occurring on March 25, 2010; Count IV: failure to intervene against Defendant Swain for events occurring on April 1, 2010; Count V: deliberate indifference to serious medical needs/interference with medical treatment against Defendant Swain on April 1, 2010 and May 26, 2010; Count VI: excessive force and failure to intervene against Defendants Fleming, Canida, and Lee based on events occurring on May 7, 2010; Count VII: deliberate indifference to serious medical needs against Defendant Gaskins on various dates between April 2010 and June 2010; Count VIII: excessive force and failure to intervene against Defendants Canida, Walden, Fleming, Jenkins, Swain, Walker, Kelly, and Salle based on events occurring on May 26, 2010; Count IX: excessive force and failure to intervene against Defendants Bullard, Harris, Maginnis, McFarland, and Slocum based on events occurring on June 10, 2010; Count X: excessive force against Defendant Norman based on events occurring on June 11, 2010; Count XI: excessive force against Defendant Harris for events occurring on May 16, 2011; and Counts XII through XIV: various claims against Defendants McNeil, Reddish, Jeffcoat, and/or Whitehead.

[3] The quality of the work in the Motion filed by the Attorney General's Office falls short of what the Court expects. For example, there are exhibits cited that were not filed. See Doc. 163 at 10 (citing Exhibit Z at various page numbers that were not filed), 22 (Index to Exhibits labeling Exhibits G, I, S, and AA as Declarations of Defendants Jenkins, Maginnis, Whitehead, and Kelly, but these exhibits were not filed; but Defendant McFarland's Declaration was filed twice (Docs. 163-7 and 163-10)). As another example, there are incomplete and inaccurate sentences. See id. at 9 ("With regard to Defendant Swain handcuffing Plaintiff in the front, in violation of his front cuff pass . . . "), 11 ("One cannot be held liable for the actions or omissions of others but can only

Federal Rule of Civil Procedure 56, and that the granting of a motion for summary judgment would result in the termination of this case. <u>See</u> Order (Doc. 31). Plaintiff filed a Response (Doc. 202). The Motion is ripe for review.

## II.  *Standard of Review*

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting <u>Jurich v. Compass Marine, Inc.</u>, 764 F.3d 1302, 1304 (11th Cir. 2014)); <u>see</u> Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); <u>see</u> <u>Hornsby-Culpepper v. Ware</u>, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable

---

be held responsible if he participated in the 1994) . . . "), 17 ("Defendants are entitled qualified immunity bars Plaintiff rights claims."). Additionally, the Motion discusses a plaintiff in an unrelated case. <u>See</u> <u>id.</u> at 16 ("Plaintiff claims to have suffered pain because of not having the heel lift and sneakers."). These inadequacies tax the already-limited judicial resources and make the decision-making more difficult. Nevertheless, the Court endeavors to address the arguments asserted.

inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

However, "[w]hen the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' in order to discharge this initial responsibility. Instead, the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290,

4

1294 (11th Cir. 1998) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 325 (1986)). "If the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then there is no genuine dispute as to any material fact because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" <u>Alston v. City of Darien</u>, 750 F. App'x 825, 831 (11th Cir. 2018) (quoting <u>Celotex Corp.</u>, 477 U.S. at 322-23); <u>see also</u> <u>Lowe v. Exel, Inc.</u>, 758 F. App'x 863, 865 (11th Cir. 2019) ("[I]f the non-moving party fail[s] to make a showing on an essential element of his case with respect to which he ha[s] the burden of proof, then the entry of judgment as a matter of law is appropriate." (quotations and citation omitted)).

## III. Discussion

Because Defendants only move for summary judgment on certain issues, the Court focuses the analysis on those issues.

### A. Failure to Intervene[4] – Defendant Salle

As part of his allegations supporting Count VIII, Plaintiff alleges the following occurred after he received a shave on May 26, 2010:

---

[4] In the Motion, Defendants label this claim as "Failure to Protect," but as Plaintiff explains in his Response, he clearly brought a failure-to-intervene claim. <u>See</u> Doc. 82 at 43; Doc. 202 at 5.

> Once Officer Canida adjusted [Plaintiff's] spit shield, Officer Canida used his hand to shove [Plaintiff] in the face. Officer Canida then slammed [Plaintiff] on the floor while he was in handcuffs, waist chain, and leg shackles. Defendant Correctional Officer Sarah Salle, who was in the control room at the time, and Walden stood by watching and did not intervene in obedience to a long-standing custom or policy at Union Correctional Institution of the code of silence and non-interference with physical abuse of inmates.
>
> As [Plaintiff] lay on the floor in handcuffs, waist chain, and leg shackles, Officer Canida punched [Plaintiff] in the face [a] couple times and kneed him in the back. Officers Salle and Walden continued to watch.

Doc. 82 at 24. As a result, Plaintiff claims that Defendant Salle violated his Eighth Amendment rights when she "stood by watching parts of the physical abuse against Plaintiff and did not intervene when [she] had an opportunity to do so." Id. at 43.

Defendants argue that Plaintiff failed to prove a constitutional violation against Defendant Salle. Doc. 163 at 6. According to Defendants, "Defendant Salle would not have had the ability to reasonably insert herself to stop the alleged assault without additional help." Id. at 7. Defendant Salle averred as follows in her Declaration: "I never witnessed the physical abuse of Inmate Milledge by any corrections officer. If I was in the control room when a use of force occurred, I am not allowed to exit the control room. Additionally, a control

room is locked, which would require the door to the control room to be unlocked prior to exi[]ting." Doc. 163-14 at 1.

In response, Plaintiff relies on his Affidavit to prove that Defendant Salle watched while Defendant Canida used excessive force on him, and Defendant Salle had the opportunity to intervene but failed to do so. Doc. 202 at 6-7; <u>see also</u> Doc. 202-1 at 15-16. He states that the "attack . . . lasted at least one minute." Doc. 202-1 at 15. He suggests that "Defendant Salle could have intervened by using her radio to request for assistance," and that based on past experience, officers would have arrived within 5-10 seconds of her radioing for help. <u>Id.</u> at 15-16.

"'[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'" <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting <u>Velazquez v. City of Hialeah</u>, 484 F.3d 1340, 1341 (11th Cir. 2007)). "To be held liable on a theory of nonfeasance, the officer must have been in a position to intervene but failed to do so." <u>Hunter v. Leeds, City of</u>, 941 F.3d 1265, 1282 (11th Cir. 2019) (citing <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 924 (11th Cir. 2000)).

Based on Plaintiff's own allegations, there was no time for Defendant Salle to intervene because the alleged assault occurred spontaneously and she was not at the scene of the alleged assault or in a position to stop it. Indeed,

Plaintiff states Defendant Canida adjusted Plaintiff's spit shield, shoved him in the face, and then slammed him on the floor. Once Plaintiff was on the floor, Defendant Canida kneed him in the back and punched him in the face a couple times. In Plaintiff's grievance dated May 28, 2010, he described the "assault" as follows: "I stood up and Officer Canida pulled my spit shield down over my face. All of sudden Officer Canida just [unreadable] me inside my face. Officer Canida then maliciously and sadistic[ally] attacked me by slamming me to the hard concret[e] floor." Doc. 163-24 at 45-46 (emphasis added).

It is undisputed that Defendant Salle was in the control room at the time of the alleged assault, and Plaintiff has failed to offer any evidence to rebut Defendant Salle's Declaration that she was not in a position to intervene. Plaintiff's Affidavit merely repeats the allegations in the Second Amended Complaint and suggests that Defendant Salle could have used her radio to request assistance. But the spontaneous nature of the force described does not lead to an inference that there was time or an opportunity for Defendant Salle to intervene from the control room to stop the alleged assault. Thus, summary judgment is due to be entered in favor of Defendant Salle on the failure-to-intervene claim against her (raised in Count VIII). All other claims in Count VIII will proceed.

## B. Deliberate Indifference to Serious Medical Needs – Defendant Gaskins

Plaintiff alleges that Defendant Gaskins was deliberately indifferent to his serious medical needs when she failed to provide and/or intentionally denied medical treatment (Count VII). He claims that on April 1, 2010, she came to his cell but refused to provide him with a sick call slip. Doc. 82 at 12. She allegedly stated, "You disrespect me yesterday, get off that door. . . . I'm going to say you gunning me Milledge so you can go on property restriction, my boyfriend Swain going to beat your ass, he will be at your door later on to counsel you, and you not getting a sick call slip." Id. Plaintiff further alleges that three days later, on April 4, 2010, he asked Defendant Gaskins for a sick call slip so he could receive treatment for his neck, shoulders, back, breathing problems, and chest pain. Id. at 16-17. However, Defendant Gaskins allegedly refused to give him a sick call slip. Id. at 17. On May 23, 2010, Plaintiff turned in a sick call slip requesting medical treatment for breathing problems, a rash, and pain in his eyes, neck, shoulder, and back. Id. at 21-22. The next day, May 24, 2010, Defendant Gaskins approached Plaintiff's cell and said, "'I have already seen you for these injuries, I'm not going to address your sick call slip, I want you to suffer.'" Id. at 22. Plaintiff turned in another sick call slip on May 31, 2010, complaining about breathing problems, a rash, and pain in his eyes, neck, shoulders, and back. Id. at 28. On June 2, 2010, Defendant Gaskins went to Plaintiff's cell and told him,

"'I got your sick call slip, but I'm not going to see you.'" Id. at 28. As a result of these actions, Plaintiff claims that Defendant Gaskins was deliberately indifferent by failing to provide medical treatment despite knowing of his serious medical needs. Id. at 42-43.

Defendants argue that "Plaintiff cannot show that he suffered from a serious medical need" or that Defendant Gaskins was "deliberately indifferent to that need." Doc. 163 at 8. More specifically, Defendants contend that "denying sick call slip requests or failing to examine Plaintiff for injuries for which he was previously examined is insufficient to constitute deliberate indifference to a serious medical need." Id. Defendants also argue that Plaintiff did not have a serious medical need, as his injuries were de minimis. Id. Additionally, Defendant Gaskins submitted a Declaration averring that Plaintiff's allegations as to her are untrue. See Doc. 163-4.

Plaintiff responds by relying on his Affidavit and contending that he advised Defendant Gaskins in person and through sick call slips that he suffered pain in his eyes, neck, shoulders, back, and chest, and that he was having breathing problems. Doc. 202 at 9. Nevertheless, Plaintiff says Defendant Gaskins failed to provide him with any medical care or treatment. Id.

"To prevail on [a] § 1983 claim for inadequate medical treatment, [the plaintiff] must show (1) a serious medical need; (2) the health care providers'

deliberate indifference to that need; and (3) causation between the health care providers' indifference and [the plaintiff's] injury." <u>Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.</u>, 871 F.3d 1272, 1279 (11th Cir. 2017) (citation omitted).

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

<u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (quotations and citation omitted).

Deliberate indifference to a serious medical need requires "three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>Farrow v. West</u>, 320 F.3d 1235, 1245 (11th Cir. 2003) (citations omitted); <u>see</u> <u>Dang</u>, 871 F.3d at 1280; <u>Melton v. Abston</u>, 841 F.3d 1207, 1223 & n.2 (11th Cir. 2016). "Subjective knowledge of the risk requires that the defendant be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Dang</u>, 871 F.3d at 1280 (quoting <u>Caldwell v. Warden, FCI Talladega</u>, 784 F.3d 1090, 1099-1100 (11th Cir. 2014)).

An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. See Harris v. Coweta Cty., 21 F.3d 388, 393-94 (11th Cir. 1994) (citing Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir. 1990)).[5] Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

---

[5] "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citation omitted). "Delayed medical treatment can rise to the level of deliberate indifference when: (1) 'it is apparent that delay would detrimentally exacerbate the medical problem'; (2) the delay actually seriously exacerbates the problem; and (3) 'the delay is medically unjustified.'" James v. Bartow Cty., Georgia, No. 18-14548, 2020 WL 376491, at *2 (11th Cir. Jan. 23, 2020) (quoting Taylor v. Adams, 221 F.3d 1254, 1259-60 (11th Cir. 2000)). However, "[i]t is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985)); see Boone v. Gaxiola, 665 F. App'x 772, 774 (11th Cir. 2016).

Dang, 871 F.3d at 1280. "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew].'" Id. (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).

Here, viewing the facts in the light most favorable to Plaintiff shows that Defendant Gaskins was not deliberately indifferent to his serious medical needs. Plaintiff contends that Defendant Gaskins failed to provide him sick call slips on April 1 and 4, 2010, and that on May 24 and June 2, 2010, she refused to see him in response to sick call slips he submitted. Notably, according to Plaintiff's own allegations, he was seen by a nurse twice on April 1, 2010, following uses of force that occurred after Defendant Gaskins allegedly failed to provide him with a sick call slip. See Doc. 82 at 12, 14-15; see also Doc. 163-22 at 54-67. He testified that he was seen by medical "a couple days" after April 1, 2010, and a doctor wrapped his thumb and gave him ice. Doc. 163-22 at 68. He was also seen twice on May 26, 2010, and once on June 10, 2010, following uses of force. Doc. 82 at 26-27.[6] Plaintiff has failed to show that any of his medical

---

[6] The medical records created immediately after the uses of force on May 26, 2010, show that after the first use of force, Plaintiff had a 2-3 cm swollen area on his right eyebrow, but no bleeding, abrasion, or drainage; and after the second use of force, his right eyebrow injury was documented as the same, and he had 4-5 superficial scratches on his left wrist with no bleeding. Doc. 163-26 at 27. After the use of force on June 10, 2010, the medical records indicate that Plaintiff had superficial abrasions on his elbows, superficial lacerations on his right temporal and frontal regions but with no active bleeding, an abrasion on

conditions were caused by or worsened by Defendant Gaskins' alleged failures on these four dates, and he has failed to demonstrate a causal connection between his alleged injuries and Defendant Gaskins' inactions. See generally James v. Bartow Cty., Georgia, No. 18-14548, 2020 WL 376491, at *2 (11th Cir. Jan. 23, 2020) ("A prisoner must provide 'verif[ied] medical evidence . . . to establish the detrimental effect of delay in medical treatment.'" (citation omitted)). Even if Defendant Gaskins ignored Plaintiff's requests for sick call slips on two occasions, and did not render treatment on two occasions, such actions do not amount to deliberate indifference in this instance. As a matter of law, Plaintiff has failed to show that Defendant Gaskins acted with deliberate indifference. Defendants' Motion is due to be granted as to Count VII.

### C. Deliberate Indifference to Serious Medical Needs – Defendant Swain

Plaintiff contends that Defendant Swain intentionally interfered with his medical treatment on April 1, 2010, and May 26, 2010, when Defendant Swain directed that Plaintiff be handcuffed behind his back despite Plaintiff's front-cuff pass (Count V). According to Defendants, Defendant Swain directed Plaintiff be handcuffed behind his back on two occasions following uses of force, and he did so to preserve internal discipline and institutional security. Doc. 163

---

his knee, and erythema and ecchymosis laterally and below the right eye. See Doc. 163-27 at 18-20.

at 9. They further argue that "Plaintiff has failed to allege a constitutional injury due to Defendant Swain handcuffing him behind the back twice, following a use-of-force." <u>Id.</u> In a Declaration, Defendant Swain avers that he "never interfered with medical treatment of Plaintiff nor was [he] aware that Plaintiff had a front cuff medical pass and ordered that he be cuffed in the back. If an inmate is violent towards staff[,] security required that he be cuffed in the back to prevent harm to staff." Doc. 163-16 at 2.

In response, Plaintiff contends that he "verbally told Defendant Swain that he had a medical pass to be cuffed in the front which could have been verified by the medical department." Doc. 202 at 9. Nevertheless, according to Plaintiff, Defendant Swain ordered that he be handcuffed behind his back on two occasions, which "caused his right shoulder to fall out of the socket." <u>Id.</u> at 10. He avers that this caused him pain and suffering. <u>Id.</u>

The record shows that on the two occasions Plaintiff was handcuffed behind his back, each occurrence happened after a use of force. On April 1, 2010, chemical agents were used on Plaintiff, he was given a decontamination shower, and then he was escorted to the medical unit for a post-use-of-force physical. <u>See</u> Doc. 82 at 12-14. Afterwards, he was taken back to his cell, where another

use of force occurred.[7] Id. at 15. After this second use of force, Defendant Swain ordered that Plaintiff be handcuffed in the back. Id.; see Doc. 163-22 at 66-67. He was taken back to a medical room where "[a] nurse once again saw [him] for a post use-of-force physical."[8] Doc. 82 at 12-14. On the second date, May 26, 2010, Plaintiff was involved in a use of force, after which he alleges that Defendant Swain ordered his handcuffs be moved from the front to the back. Id. at 26. According to Plaintiff, Defendant Swain knew that he had a medical pass to be handcuffed in the front at all times. Id. Plaintiff was escorted to a medical room and examined by a nurse for a post-use-of-force physical. Id. Plaintiff complains that the nurse did not document his injuries and refused to examine his chest area. Id.

On both occasions, Plaintiff was immediately examined by medical staff after he was handcuffed behind his back. He does not claim that the handcuffing behind his back lasted for a long period of time. Even assuming Defendant Swain knew of Plaintiff's front cuff pass, which he denies, the decision to temporarily handcuff Plaintiff behind his back following two uses of force does not rise to the level of deliberate indifference or intentionally interfering with

_____

[7] Plaintiff alleges that an officer grabbed his "left thumb and twisted it way back in an attempt to break it." Doc. 82 at 14-15.

[8] Plaintiff alleges that an unnamed nurse examined him, he complained to two nurses about his eyes burning, and the "nurses said to [Plaintiff] that they don't have nothing to wash his eyes out with." Doc. 82 at 15.

medical treatment, especially when Plaintiff has not presented any evidence to support his assertion that this caused "his right shoulder to fall out of the socket." Courts generally defer to corrections officials when making judgments regarding prison safety and security. <u>See generally</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979) ("Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel."). Defendant Swain's decision regarding how to handcuff an inmate immediately following a use of force deserves deference. Defendants' Motion is due to be granted as to Count V.

### D. Claims against Defendants McNeil, Reddish, Jeffcoat, and Whitehead

Plaintiff raises three claims (Counts XII, XIII, XIV) against four supervisory Defendants: McNeil, Reddish, Jeffcoat, and Whitehead.[9] In the Motion, Defendants do not specifically address Plaintiff's Counts. Rather, they divide their arguments as to the supervisory Defendants into two parts: "Grievance Liability" and "Supervisory Liability." <u>See</u> Doc. 163 at 9-12. They argue that Defendants McNeil, Reddish, Jeffcoat, and Whitehead can neither be held liable merely because they responded to or failed to respond to Plaintiff's

---

[9] During the relevant timeframe, Defendant McNeil was the Secretary of the Florida Department of Corrections; Defendant Reddish was the Warden at UCI; and Defendants Jeffcoat and Whitehead were Assistant Wardens at UCI.

grievances, nor can they be held liable based on supervisory liability. <u>See</u> <u>id.</u> They assert that the only evidence Plaintiff has of a custom or practice is his testimony about what he sees the correctional staff do, and they further assert that Plaintiff's own experiences of alleged abuse "is not evidence of widespread abuse." <u>Id.</u> at 11-12. For clarity, the Court sets out the law regarding supervisory liability before analyzing each count.

"Supervisory officials cannot be held vicariously liable under section 1983 for the actions of their subordinates unless the supervisor 'personally participates in the alleged unconstitutional conduct' or 'there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.'" <u>Smith v. Deal</u>, 760 F. App'x 972, 975 (11th Cir. 2019) (quoting <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003)).

> The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Alternatively, the causal connection may be established when a supervisor's "'custom or policy . . . result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

<u>Cottone</u>, 326 F.3d at 1360 (internal citations omitted). When a plaintiff's claim of supervisory liability is based on a history of widespread abuse, "[t]he deprivations that constitute widespread abuse sufficient to notify the

supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Knight through Kerr v. Miami-Dade Cty., 856 F.3d 795, 820 (11th Cir. 2017). "[T]he standard by which a supervisor is held liable in h[is] individual capacity for the actions of a subordinate is extremely rigorous." Id. (quotations and citation omitted).

### i. Count XII

Count XII claims that Defendants McNeil, Reddish, and Jeffcoat failed to ensure Plaintiff received appropriate medical treatment after they "were aware of facts that gave rise to an inference of risk of serious harm and drew that inference as well and actual notice through Plaintiff's grievance of appeal." Doc. 82 at 45. Plaintiff states that these Defendants "received numerous requests for medical treatment from Plaintiff that described the seriousness of the injuries and the pain they caused and [Defendants] showed deliberate indifference to the injuries and pain." Id. at 46; see also Doc. 163-22 at 26 (Plaintiff testifying at his deposition that he sent grievances to the supervisory Defendants regarding needing surgery on his shoulder).[10] He claims that they were the "policymakers who were responsible for the provision of medical care at [UCI],

---

[10] Plaintiff had surgery on his left shoulder in December 2009. See Doc. 202-17 at 5.

and they had the power to see that timely medical care was provided to Plaintiff." Doc. 82 at 45-46.

These supervisory Defendants are not alleged to have personally participated in Plaintiff's medical care or treatment. Rather, Plaintiff essentially claims that they should have intervened and directed that he receive appropriate care once they were put on notice through his grievances that his medical care was inadequate. While Plaintiff asserts these Defendants were advised through his grievances about his need for medical care,[11] only Defendant Jeffcoat responded to Plaintiff's medical grievances, and some of the grievances that Defendant Reddish responded to relating to Plaintiff's alleged abuse included allegations regarding inadequate medical care. See Doc. 163-24 at 18-22, 25-28, 35-36, 43-52, 59-60.[12] Defendant McNeil avers that "[a]s the Secretary of the Florida Department of Corrections, I did not respond to grievances. There is an office in the Department that is tasked with responding to grievances. The person that reviewed the grievance signs the grievances. If I

---

[11] Plaintiff testified at deposition that he never spoke to Defendant McNeil, but he had conversations with Defendants Reddish, Whitehead, and Jeffcoat about his claims. See Doc. 163-22 at 14-18. It is unclear which Defendants he spoke to about which claims. See id. When asked how Defendants were aware of his lack of adequate medical care, he said through his grievances. Id. at 20.

[12] As discussed in more detail below, the grievances reviewed by Defendant Reddish were forwarded to the Office of the Inspector General for appropriate action.

had reviewed or responded to this inmate's grievances, the grievance would bare my signature." Doc. 163-11 at 1.

Insofar as Plaintiff argues that Defendants should be deemed to have subjective knowledge simply because Plaintiff directed grievances to them or their respective offices, this argument, without more, is insufficient to defeat summary judgment. There is no indication that Defendant McNeil had any knowledge of Plaintiff's complaints about his medical care, and the grievances that Defendant Reddish responded to largely focused on alleged abuse—not on medical care. Regardless, as explained herein, the supervisory Defendants are entitled to rely on the medical decisions and expertise of medical staff. See Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1050 (11th Cir. 2014) (stating that "the law does not require that [the] Sheriff . . . ignore the determination and recommendation of" medical staff); Williams v. Limestone Cty., Ala., 198 F. App'x 893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.").

The grievance responses signed by Defendant Jeffcoat were also signed by the Chief Health Officer. See Doc. 163-24 at 29 (April 7, 2010; "Review of your medical record shows you have a scheduled appointment for physical therapy in the near future. We had to wait for the approval before scheduling."); Doc. 163-24 at 65 (April 26, 2010; "Review of your record shows that you have

been refusing some of your treatment and there is no evidence that you have been denied treatment. . . . Since inmates do not choose their therapist your request for another therapist is denied."); Doc. 163-24 at 73 (April 29, 2010; "Review of your medical record shows you are not being denied treatment. Your request to change counselors is denied."); Doc. 163-23 at 1 (May 6, 2010; "Review of your medical record shows you have been seen on numerous occasions in sick call for these complaints, referred to the doctor and seen by the doctor. You continue under the care of the specialist for these issues. Ms. Gaskins denies your allegations, has seen you on sick call and referred you to the doctor. On April 13, 2010 when Ms. Gaskins attempted to see you for a medical emergency, documentation shows you refused to be seen by her."); Doc. 163-23 at 5 (June 29, 2010; "Review of your medical record shows a refusal for sick call on May 24, 2010. The nurse denies your allegations. It is noted you were seen on sick call on June 7, 2010 for the same complaint. Your thumb X-Rays were normal. You refused your labs. You have a GI X-Ray pending. Your chart was referred to the doctor and you have an appointment pending in the near future."); Doc. 163-24 at 37 (June 29, 2010; "Review of your medical record shows a note from the nurse on June 2, 2010 where you told her you wanted her to refer you to a doctor at RMC. After being told the doctor here would have to do the referral, you informed her you were 'seeing one this month and didn't need to see her.' The nurse denies your allegations. You were seen by the doctor on May 24, 2010

for the medical issues. You refused your lab tests and have a GI series scheduled."). Plaintiff was repeatedly advised that he was receiving appropriate medical care. See id.; see also Doc. 163-24 at 23 (August 3, 2010; "It is the responsibility of your Chief Health Officer to determine the appropriate treatment regimen for the condition you are experiencing. Records reviewed indicate that you were seen by the Orthopedist on 4/27/10 and recommended for physical therapy. Physical therapy was started on 4/30/10 however it was discontinued after your refusal on 6/24/10. Please be advised that when an inmate refuses treatment, he/she must take on some of the responsibility for any adverse effects that may occur."); Doc. 163-24 at 85 (August 3, 2010); Doc. 163-24 at 69 (October 10, 2010 response signed by a different CHO, stating "Your medical record has been reviewed and your complaint considered. The ARNP who examined you on 10/4/10 determined through her evaluation that you did not need a front cuff pass. She did offer you a double behind the back pass which you refused. The ARNP also advised you that you could get Tylenol and Ibuprofen from your dorm officers."). Plaintiff has not shown that his medical condition was so dire that it would have been obvious to any nonmedical official. There were various layers of review of Plaintiff's complaints and multiple individuals involved in Plaintiff's medical care. It cannot be said based on this record that Defendants McNeil, Reddish, or Jeffcoat knew of

unconstitutional conduct and failed to act or otherwise acted with deliberate indifference to Plaintiff's rights.

Moreover, Plaintiff has not shown that the supervisory Defendants were responsible for a policy of failing to provide appropriate medical care or were aware of widespread, obvious issues with inmates not receiving appropriate medical care. Plaintiff's conclusory assertions are insufficient to defeat summary judgment. There is no causal connection between any of the supervisory Defendants and any violation of Plaintiff's rights based on his medical care or treatment. Thus, Defendants are entitled to summary judgment on Count XII.[13]

### ii. Count XIII

Count XIII claims that Defendants McNeil, Reddish, Whitehead, and Jeffcoat are liable for the acts of excessive force by the subordinate Defendants and other correctional officers not named as defendants, and they were

---

[13] Even more, "'there can be no supervisory liability . . . if there was no underlying constitutional violation." Green v. Hooks, No. 17-11785, 2020 WL 57329, at *13 (11th Cir. Jan. 6, 2020) (quoting Paez v. Mulvey, 915 F.3d 1276, 1291 (11th Cir. 2019)). The Court has found that Defendants Gaskins and Swain were not deliberately indifferent to Plaintiff's serious medical needs. The only claim remaining that involves Plaintiff's medical care and treatment is against Defendant Fleming (Count II) for allegedly failing to take Plaintiff to obtain medical treatment after the alleged March 15, 2010 use of force. Even if proven, one incident of misconduct would not subject the supervisory Defendants to liability.

deliberately indifferent in the supervision and retention of those individuals "and in the acquiescence to those officers' acts of excessive force." Doc. 82 at 46. Plaintiff asserts that Defendants "McNeil, Reddish, Whitehead, and Jeffcoat were aware of a history of widespread abuse of inmates at" UCI and they "failed to discipline officers who physically abused inmates or failed to discipline officers who stood by watching other officers physically abuse inmates." <u>Id.</u> at 47; <u>see</u> Doc. 202-1 at 25-26 (Plaintiff averring in his Affidavit that the supervisory Defendants "received notice of prison officials['] abuse towards inmates at [UCI] by and through incident reports, abuse of force reports, inmate grievances, inmate letters, civilian letters, inspector reports and findings, government agency letters including the Court letters and orders, audit team reports, and other documents," but "they failed to take corrective steps to stop it before and or after the incidents in question"). He further claims that they were aware of the threats against him prior to the uses of force. Doc. 82 at 47-50; <u>see</u> Doc. 202-1 at 25-26. Plaintiff argues in response to the Motion that he "pled that Defendants Reddish, McNeil, Whitehead, and Jeffcoat had or maintained a custom or policy at [UCI] of the code of silence and non-interference with physical abuse of inmates." Doc. 202 at 28-29. To prove this policy or custom, he relies on his own allegations, stating that officers stood by while he was subjected to excessive force and the officers failed to intervene. <u>See</u> <u>id.</u> at 29.

Defendants Jeffcoat, Reddish, and McNeil filed Declarations.[14] Defendant Jeffcoat avers that she "never witnessed, nor condoned the abuse, of any kind, of Inmate Milledge by any of . . . the corrections officers named in this law suit[, n]or was [she] made aware of such abuse through the grievance process." Doc. 163-6 at 1. She further states that she is "not aware of any 'long-standing custom or policy at [UCI] of the code of silence and non-interference with physical abuse of inmates.'" Id. at 2. Defendant Reddish's Declaration is nearly identical to Defendant Jeffcoat's Declaration. See Doc. 163-13. Similarly, Defendant McNeil asserts that, as the Secretary, he did not respond to grievances and he "was not aware of a pattern or practice of abuse of prisoners at [UCI] nor would such a pattern or practice [be] condoned by [him]." Doc. 163-11 at 1-2.

Plaintiff stated at his deposition that "none of the officers in [his] case got disciplined . . . by the top officials." Doc. 163-22 at 25. Plaintiff essentially tries to pin supervisory liability on Defendants McNeil, Reddish, Jeffcoat, and Whitehead because they did not discipline the officers who allegedly assaulted him. He also testified that "inmates was constantly getting beat up there," and

---

[14] Although Defendants' Index to Exhibits identifies "Declaration of Defendant Whitehead" as Exhibit S, Doc. 163 at 22, Defendants did not file Defendant Whitehead's declaration.

"officers getting fired left and right," so he apparently assumes that this all amounts to widespread abuse for which Defendants should have known. Id.

Plaintiff has failed to present any evidence showing that the supervisory Defendants failed to supervise or discipline officers, that they were deliberately indifferent to a substantial risk of harm, that they were aware of a history of widespread abuse and failed to take measures to correct it, or that they had or maintained a policy or custom that resulted in deliberate indifference to Plaintiff's rights. Defendants McNeil, Whitehead, and Jeffcoat did not respond to any of Plaintiff's grievances relating to the alleged abuse. Insofar as Plaintiff contends that because he submitted grievances to the supervisory Defendants' offices, there is "a plausible basis to infer" that they would "review [a] grievance that is filed and stored at their office," Doc. 202 at 25-26, plausibility and speculation are insufficient to overcome summary judgment. See Shiver, 549 F.3d at 1343 ("Speculation does not create a genuine issue of fact." (quotations and citation omitted)). He has not supported his conclusory assertions.

Defendant Reddish responded to some of Plaintiff's grievances regarding Plaintiff's complaints relating to the alleged abuse, and the grievances were submitted to the Office of the Inspector General for appropriate action.[15]

---

[15] See Doc. 163-24 at 25 (March 30, 2010 grievance response signed by Defendant Reddish, advising that Plaintiff's complaints regarding the incident on March 15, 2010 with inmate Willis, which forms the basis of Counts I and II, had been referred to the IG for appropriate action); Doc. 202-7 at 4 (March 30,

Plaintiff has failed to present any evidence suggesting that Defendant Reddish's actions of referring his grievances to the IG's office was unreasonable or that he should have done more. Additionally, Plaintiff does not allege or show that any of the investigations resulted in a finding that the officers' actions were unjustified. Indeed, the IG report based on the May 26, 2010 uses of force shows that Plaintiff's allegations were "not supported by the evidence reviewed and therefore [were] not substantiated." Doc. 163-26 at 5. Moreover, during discovery, at Plaintiff's request, the Court ordered Defendants to produce any

2010 grievance response signed by Defendant Reddish, advising that Plaintiff's complaints of excessive force and failure to intervene against Defendants Fleming, Canida, and Lee (Count III) had been reported to the IG for appropriate action); Doc. 163-24 at 59 (April 2, 2010 grievance response signed by Defendant Reddish, advising Plaintiff that his allegations that on April 1, 2010, Defendant Gaskins refused to give him a sick call slip and threatened him by saying Defendant Swain would beat him (part of Count VII) were referred to the IG for appropriate action); Doc. 163-24 at 61 (April 2, 2010 grievance response signed by Defendant Reddish, advising Plaintiff that his allegations that Defendant Swain threatened him on April 1, 2010 were referred to the IG for appropriate action); Doc. 163-24 at 18 (April 14, 2010 grievance response signed by Defendant Reddish, advising that Plaintiff's complaints regarding the uses of force on April 1, 2010 had been referred to the IG for appropriate action (the allegations in this grievance relate to Count IV against Defendant Swain for failing to intervene)); Doc. 202-10 at 3 (April 28, 2010 grievance response signed by Defendant Reddish, advising that Plaintiff's complaints about Defendant Swain threatening him on April 2, 2010 were referred to the IG for appropriate action); Doc. 163-24 at 43 (June 4, 2010 grievance response signed by Defendant Reddish, advising Plaintiff that his allegations regarding the use of force on May 26, 2010 "w[ere] previously reported" to the IG (Count VIII)); Doc. 163-24 at 35 (June 6, 2011 grievance response signed by Defendant Reddish, advising Plaintiff that his allegations of force, including those against Defendant Harris (Count XI), were referred to the IG for appropriate action).

disciplinary files concerning allegations of excessive force or failure to intervene for Defendants Fleming, Canida, Swain, Jenkins, Walden, Kelly, Walker, Harris, Maginnis, Bullard, Slocum, McFarland, Norman, Lee, Salle, and Gaskins for the five-year period preceding the dates of the alleged incidents sued upon. Doc. 172 at 2-3. Defendants acknowledged that there were responsive documents as to one Defendant, Doc. 188 at 2, and those documents were provided for Plaintiff's review on September 13, 2019, Doc. 189 at 2. The responsive documents related to Defendant Bullard. See Doc. 189-1.[16] Other than Plaintiff's conclusory allegations, there is nothing to suggest that the Defendants or other correctional officers had a history of using excessive force, such that the supervisory Defendants should have taken additional action.

Moreover, at deposition, Plaintiff testified that there is no written policy, but an officer who stood by watching an inmate be abused was demonstrating the policy. Doc. 163-22 at 22-23 ("I don't got to have no written document saying that. Because, based on that, if officer stand by and watch another officer beat an inmate, that's a code of silence. That's unwritten policy."). Plaintiff has not provided any factual detail about other inmates being subjected to abuse or documentary evidence to support his conclusory assertions that the abuse was widespread. He also has not presented evidence upon which a reasonable jury

---

[16] The Court has not been provided with the responsive documents.

could conclude that there is a causal connection between the actions of the supervisory Defendants and the alleged constitutional deprivations. Thus, Defendants are entitled to summary judgment on Count XIII.

### iii. Count XIV

Count XIV claims that Defendants McNeil, Reddish, Whitehead, and Jeffcoat were deliberately indifferent to a substantial risk of harm to Plaintiff in that they failed to protect Plaintiff from Defendants Fleming, Canida, Lee, and Swain. Doc. 82 at 50-53; <u>see also</u> Doc. 202 at 14, 19-20. He asserts that a reasonable jury could find that the supervisory Defendants "had knowledge that Plaintiff faced a risk of serious harm from either Defendants Fleming, Canida, Swain, Lee, and other prison officials and disregarded that risk by failing to take reasonable measures to abate it." Doc. 202 at 22. He argues that they received knowledge through the grievances he directed to them. <u>See</u> Doc. 202 at 15-20.

Defendants argue that they cannot be held liable based on grievances alone. The Court agrees that Plaintiff has failed to present any evidence to show a causal connection between these Defendants and a violation of his constitutional rights. Plaintiff has not offered evidence to support his contention that these Defendants had notice of a history of widespread abuse or that there was a policy, custom, or practice that resulted in a constitutional violation. He has not shown that these Defendants directed the subordinate Defendants to

act unlawfully or that they knew the subordinate Defendants would act unlawfully and failed to take any action.[17] His own grievances about his own alleged abuse is insufficient, especially when the record shows that the only supervisory Defendant who responded to the grievances about the alleged abuse and threats was Defendant Reddish, and Plaintiff's complaints were referred to the IG for appropriate action. Even assuming that the supervisory Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," there is nothing to suggest that they "also dr[e]w the inference." Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007) (quotations and citation omitted). Even more, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 838 (1994). In sum, Plaintiff has failed to demonstrate the requisite causal connection to meet the rigorous standard for supervisory liability, and Defendants are entitled to summary judgment on Count XIV.

---

[17] As previously noted, in the five years preceding the incidents alleged in this case, the only Defendant to have a disciplinary history with respect to excessive force or failure to intervene was Defendant Bullard.

### E. Threats by Staff

Without pointing to any specific allegations or claims, Defendants argue that "[t]he fact that Plaintiff was only threatened with future conduct is insufficient to state a claim under § 1983." Doc. 163 at 13. The Court declines to guess which claims and Defendants this argument is aimed. The Motion is denied in this regard.

### F. <u>De Minimis</u> Injury – Compensatory and Punitive Damages

According to Plaintiff, after Defendants Canida, Fleming, and Lee failed to protect and/or intervene when Plaintiff was being assaulted by another inmate, Plaintiff's nose was bleeding and he had "agonizing pain in his back." Doc. 82 at 8; <u>see</u> <u>id.</u> at 9 ("Plaintiff suffered injuries to his shoulders and back and had a laceration on the top and underneath his nose area."). As a result of Defendant Fleming punching Plaintiff in the stomach on March 25, 2010, he suffered injuries to his back, and he had "agonizing pain in his stomach for approximately one (1) week." Doc. 82 at 10-11. The April 1, 2010 uses of force (chemical and physical) caused Plaintiff to suffer "injuries to his shoulders, back, eyes, left thumb, and knee, and [he] also suffered from breathing problems and chest pain and [he] had a laceration to his left thumb," which was "swollen for approximately two (2) weeks." <u>Id.</u> at 15. According to Plaintiff, the May 7, 2010, unnecessary use of force caused injuries to his shoulders and back,

bruised marks on his chest, and a laceration on his ankle. Id. at 20. He complained about breathing problems, a rash, and pain in his eyes, neck, shoulder, and back on May 23, 2010. Id. at 21-22. The May 26, 2010, uses of force resulted in injuries to Plaintiff's "head, shoulders, eyes, and back, and [he] had bruised marks to his chest area and both arm areas. [His] right eye was also bruised and swollen for approximately (2) weeks." Id. at 27. As a result of "the attack" on June 10, 2010, "Plaintiff suffered injuries to his head, eyes, ribs, shoulders, knee, back, and ankle, and had a laceration to his knee area. Plaintiff's right eye was also bruised and swollen for approximately two (2) weeks." Id. at 33. The following day, June 11, 2010, Plaintiff was subjected to physical force and suffered "injuries to his right shoulder, right bending arm, and right pinky finger." Id. at 35. The use of force on May 16, 2011, resulted in "injuries to [Plaintiff's] neck, shoulders, and back and [he] also had bruised marks to his chest area." Id. at 36.

In the Motion, Defendants assert that "Plaintiff's injuries described in the complaint are not greater than de minimis." Doc. 163 at 13. They contend that Plaintiff admitted at deposition that his "injuries were old injuries that were aggravated,"[18] and they argue that his claims for compensatory and punitive damages should be dismissed. Id. at 14.

---

[18] Plaintiff was asked at his deposition, "So all the injuries that you listed were pre-existing injuries that have been aggravated based on this alleged abuse?"

Plaintiff contends in his Response that as a result of the uses of excessive force, which included being "beat[en] or kicked," and "choked or knocked unconscious," he "sustained either lacerations, bruises, swelling to face, black eye, head injury, eyes injury, right shoulder injury, right joint injury, left thumb injury, and back injury." Doc. 202 at 37. He claims that he sought medical treatment for those injuries, and he continued to seek "medical attention for his head injury, eyes injury, right shoulder injury, and back injury which is causing him excruciating pain on a daily basis." Id.

"The [Prison Litigation Reform Act (PLRA)] places substantial restrictions on the judicial relief that prisoners can seek, with the goal of 'reduc[ing] the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints.'" Brooks v. Warden, 800 F.3d 1295, 1307 (11th Cir. 2015) (quoting Al-Amin v. Smith, 637 F.3d 1192, 1195 (11th Cir. 2011)). Section 1997e(e) of the PLRA provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C.

---

Doc. 163-22 at 11. He responded, "Yes." Id. In his Affidavit, he states: "Notably, I made a mistake by agreeing that all my injuries are pre-existing injuries. I'm clarifying my statement to say that my shoulders, ribs, and back are the only pre-existing injuries." Doc. 202-1 at 22.

§ 1997e(e). "Tracking the language of the statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody." Napier v. Preslicka, 314 F.3d 528, 532 (11th Cir. 2002). The statute does not define "physical injury," but the Eleventh Circuit has clarified that, "in order to satisfy section 1997e(e), the physical injury must be more than de minimis, but need not be significant." Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir.1999), reh'g en banc granted and opinion vacated, 197 F.3d 1059 (11th Cir.1999), opinion reinstated in relevant part, 216 F.3d 970, 972 (11th Cir. 2000). While compensatory and punitive damages are precluded in the absence of a more than de minimis physical injury, "nominal damages may still be recoverable." Al-Amin, 637 F.3d at 1198.

The only medical records submitted by Defendants are the post-use-of-force examination notes dated May 26, 2010, and June 10, 2010. Defendants rely on the allegations in the Second Amended Complaint and Plaintiff's admission at his deposition that his injuries were pre-existing injuries that were aggravated by Defendants' actions and inactions. See Doc. 163 at 13-15. That Plaintiff may have worsened his pre-existing injuries does not necessarily mean the injuries are de minimis. On this record, the Motion will be denied to the extent Defendants seek to limit Plaintiff's damages.

## G. Nominal Damages

Defendants assert that Plaintiff did not request nominal damages. Doc. 163 at 15-16. However, as Defendants acknowledge, the Eleventh Circuit has determined that a plaintiff sought nominal damages when his complaint requested compensatory damages and any other relief the court deems appropriate. See id. at 16 (citing Boxer X v. Donald, 169 F. App'x 555, 559 (11th Cir. 2006)). In the Second Amended Complaint, Plaintiff specifically requests "[a]ny additional relief this Court deems just, proper, and equitable." Doc. 82 at 54. Thus, Defendants' Motion is due to be denied in this regard.

## H. Eleventh Amendment Immunity

Defendants assert they are entitled to Eleventh Amendment immunity from suit in their official capacities. See Doc. 163 at 16-17. Plaintiff responds by arguing that he sued each defendant in his/her individual capacity, and thus the Eleventh Amendment does not apply. Doc. 202 at 47; see Doc. 82 at 2-5. Therefore, Defendants' Motion will be denied because Plaintiff does not sue Defendants in their official capacities.

## I. Qualified Immunity

Defendants address the law governing qualified immunity and conclude that they "are entitled to qualified immunity because their actions were objectively reasonable in the performance of their duties and the Defendants did not violate Plaintiff's constitutional rights." Id. at 19. Given Defendants'

failure to identify the claims to which they believe they are entitled to qualified immunity, the Court denies the Motion in this regard.

## J. Severance for Trial

Defendants request that the Court sever "for trial the Defendants['] acts of alleged excessive force," because "Plaintiff has clearly joined parties improperly in this action." Doc. 163 at 19.

Rule 20(a), Federal Rules of Civil Procedure, provides in pertinent part:

> Persons . . . may be joined in one action as defendants if:
>
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Once a defendant is joined, a plaintiff "may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a).

> Joinder is strongly encouraged and the rules are construed generously toward entertaining the broadest possible scope of action consistent with fairness to the parties. However, district courts have broad discretion to join parties or not and that decision will not be overturned as long as it falls within the district court's range of choices.

<u>Vanover v. NCO Fin. Servs., Inc.</u>, 857 F.3d 833, 839 (11th Cir. 2017) (quotations and citations omitted).

Considering Plaintiff's allegations on the whole, the Court finds the remaining claims and Defendants are sufficiently related to proceed in one lawsuit. Thus, the Defendants' Motion seeking a severance of Plaintiff's claims for trial will be denied.

### K. Discovery Issues

Throughout his Response, Plaintiff requests that the Court order the Defendants and/or the Florida Department of Corrections to file his medical records and a variety of other documents. Doc. 202 at 12-13, 22-24, 31-33, 43-45. Plaintiff's request is due to be denied because it is improper to make requests for relief in a response. <u>See</u> Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion."). Moreover, Plaintiff was given more than a reasonable opportunity to review the discovery in this case, and more than sufficient time to file a response to the Defendants' Motion for Summary Judgment. <u>See</u> Orders (Docs. 137, 172, 192, 201).

Accordingly, it is

**ORDERED**:

1.     Defendants' Motion for Partial Summary Judgment (Doc. 163) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that summary judgment is entered in favor of Defendants on Count V,

Count VII, Count XII, Count XIII, Count XIV, and the portion of Count VIII against Defendant Salle. Judgment to that effect is withheld pending adjudication of the remainder of the claims. <u>See</u> Fed. R. Civ. P. 54. The Motion is otherwise **DENIED**. As Defendants did not move for summary judgment on the remaining counts, this case will proceed on Counts I-IV, VI, VIII (with the exception of the failure to intervene claim against Defendant Salle), and IX-XI.

2.　　Plaintiff's requests made in his Response (Doc. 202) are **DENIED**.

3.　　Plaintiff has another case pending in this Court (case no. 3:17-cv-483-J-39MCR) that is set for a settlement conference before the Honorable Monte C. Richardson, United States Magistrate Judge, on April 21, 2020. The Court requests that the parties engage in good-faith settlement discussions regarding this case during that settlement conference as well.[19]

4.　　Plaintiff is represented by Cindy Laquidara, Esquire in case no. 3:17-cv-483-J-39MCR. The Court finds it appropriate to appoint Ms. Laquidara for the limited purpose of representing Plaintiff in this case at the settlement conference.[20] Therefore, Plaintiff's Motion for Appointment of Counsel (Doc.

---

[19] The Court acknowledges that the parties previously attempted to settle this case in December 2019. <u>See</u> Minute Entry (Doc. 205). The landscape of the case has now changed as a result of the summary-judgment ruling.

[20] Pursuant to the cost reimbursement program, appointed counsel is permitted to be reimbursed for certain costs incurred during the representation of Plaintiff. A form explaining allowable costs and the procedure for obtaining reimbursement is available on the Court's website: www.flmd.uscourts.gov.

206) is **GRANTED to the extent** that Ms. Laquidara will also represent Plaintiff in this case at the upcoming settlement conference. Ms. Laquidara shall acknowledge this appointment by filing a notice of appearance. The Court appreciates the services of appointed counsel.

5. Counsel for all parties shall review Judge Richardson's Order Scheduling the Settlement Conference (Doc. 162), Case No. 3:17-cv-483-J-39MCR, and ensure compliance with all terms and deadlines.[21] Pending the outcome of the settlement conference, this case is **STAYED,** and the Clerk shall administratively close the file.

6. The Clerk shall mail a copy of this Order and Plaintiff's Second Amended Complaint (Doc. 82) to Ms. Laquidara.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of February, 2020.

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 2/10
c:
Honorable Monte C. Richardson
United States Magistrate Judge

Corey Milledge, #Q12023
Counsel of Record
Cindy Laquidara, Esquire

---

[21] The Clerk will provide Defendants' counsel with a copy of Judge Richardson's Order.